# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRANDON J. CAMPBELL,<br><br>Defendant. | CASE NO. 2:21-CR-245<br><br>JUDGE SARAH D. MORRISON |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States submits this Sentencing Memorandum for Brandon J. Campbell's upcoming sentencing hearing. The Government agrees with the factual findings and guideline calculations from the Presentence Investigation Report, which set the advisory sentencing range at 78-97 months of imprisonment. An appropriate sentence falls within that range. Accordingly, the Government recommends a sentence of **78 months of imprisonment**, to be followed by a three-year term of supervised release, and imposition of a $200 mandatory special assessment.

### I. BACKGROUND[1]

In December 2021, the Grand Jury returned a two-count Indictment against Campbell, which charged him with aggravated robbery of two different postal employees. PSR, ¶¶ 1-3. On March 11, 2022, Campbell pled guilty to both counts pursuant to a written plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(A). *Id.* at ¶ 4.

---

[1] All facts are drawn from the Presentence Investigation Report ("PSR"), docketed at ECF No. 32.

Campbell's guilty plea stemmed from two robberies that he committed at gunpoint in September 2021. *Id.* at ¶ 7. The circumstances of each robbery are eerily similar. During each robbery, Campbell, who was aided by an accomplice, approached a United States Postal Service ("USPS") letter carrier while wearing a full ski mask. *Id.* at ¶¶ 8-9. Campbell then snuck up to each victim from behind while brandishing a handgun. *Id.* While holding each victim at gunpoint, Campbell demanded the letter carriers' "arrow keys," which are used to access USPS mailboxes and receptacles. *Id.* During the second robbery, Campbell even threatened to shoot the letter carrier if he refused to turn over his arrow keys. *Id.* After obtaining possession of the keys, Campbell and his accomplice fled on foot and, eventually, by car. *Id.*

The victims of Campbell's robberies continue to suffer to this day. *Id.* at ¶¶ 15-16. Victim #1 reports that he now suffers from anxiety while on the job, must remain hyper-vigilant when delivering the mail, and has "<u>ask[ed] the Court to consider imposing the maximum sentence allowable</u>." *Id.* at ¶ 15 (emphasis added). Victim #2, who has been a letter carrier for over 27 years, is now retiring three years early at the request of his spouse, who "struggles daily knowing that [her husband] could be the potential victim of another armed robbery, especially in light of the [recent] increase of USPS mail carrier robberies." *Id.* at ¶ 16. Victim #2 also suffers from anxiety because of the robbery and has requested that the Court "<u>impos[e] the maximum term of imprisonment allowable</u>" because "the defendant's actions have caused daily undue stress on themselves and their spouse." *Id.* (emphasis added). Victim #2 summarized his feelings regarding the robbery as follows:

> Victim #2 believes that USPS mail carriers should not have to carry the burden of potentially being the victim of such violent offenses simply for carrying out their job function. Victim #2 would like to see the defendant punished severely for his actions and the subsequent anxiety and worry it has caused them and their family.

*Id.*

After the second robbery, investigators tracked Campbell—through his car—to a nearby apartment complex. *Id.* at ¶ 10. Officers attempted to conduct a traffic stop on his vehicle, but Campbell and his accomplice fled into the apartment complex and later escaped. *Id.* Investigators then obtained a search warrant for the apartment that Campbell fled into. *Id.* While executing that warrant, investigators found four firearms, in addition to the ski mask that Campbell had worn during the robbery. *Id.* Investigators also obtained a search warrant for the car that Campbell had abandoned and his cell phone, which was located inside the vehicle. *Id.* at ¶ 11. A forensic analysis of that phone showed that it was in the precise location of both robberies when they occurred. *Id.* Campbell's phone also contained several incriminating photos on the dates of both robberies that showed him holding a Glock 19x handgun that matched the description of the gun the victims' provided and one of the firearms that investigators found in the apartment. *Id.*

Although it is not clear what Campbell did with the arrow keys he stole, there is a sizeable black market for those keys since they can be used to access *all* USPS boxes and receptacles in a particular geographic area. *See id.* at ¶ 12; *see also* Postal Times, Thieves Keep Using Postal Master Keys to Steal Mail: How Are They Getting Ahold of Those Keys?, https://postaltimes.com/postalnews/thieves-keep-using-postal-master-keys-to-steal-mail-how-are-they-getting-a-hold-of-those-keys/ (last accessed May 24, 2022). Indeed, Columbus has experienced a *rash* of mail theft from USPS receptacles following Campbell's robberies. *See* Steve Levine, Mailbox Thefts in Columbus Linked to String of Letter Carriers Being Robbed at Gunpoint, ABC 6 News, https://abc6onyourside.com/news/local/mailbox-thefts-in-columbus-linked-to-string-of-letter-carriers-being-robbed-at-gunpoint (last accessed May 24, 2022). As of January 2022, the Columbus Division of Police had forwarded over 273 reports of mail theft to the Postal Service since last fall. *Id.*

3

After Campbell was indicted, the parties entered into a non-binding plea agreement. *Id.* at ¶ 4. That agreement contained several advisory sentencing stipulations, including a Base Offense Level of 20 for each robbery; a 2-level enhancement for each robbery because Campbell stole property belonging to the postal service; and a 5-level enhancement for each robbery because Campbell brandished or possessed a firearm while robbing each letter carrier. *Id.* at ¶ 5. The parties also agreed to a 3-level reduction for timely acceptance of responsibility, resulting in a Total Offense Level of 26 after application of the multiple-count grouping rules. *Id.* The parties made no representations regarding Campbell's criminal history. *Id.*

On May 24, 2022, the Probation Office released Campbell's Final PSR. The Probation Officer calculated a Total Offense Level of 26, which mirrored the recommendations contained in the parties' plea agreement, and a Criminal History Category of III, which results in a guidelines range of 78-97 months of imprisonment. *Id.* at ¶ 95. Campbell has filed two objections to the guideline calculations from the PSR, both of which center on his criminal history scoring. *Id.* at Addendum. The Government has not filed any objections to the guideline calculations and agrees with the Probation Officer as to Campbell's criminal history scoring. *Id.*

## II. LEGAL STANDARDS

After *Booker v. United States*, 543 U.S. 220 (2005), district courts must engage in a three-step sentencing procedure. Courts must first determine the applicable guidelines range, then consider whether a departure from that range is appropriate, and finally, consider the applicable guidelines range—along with all the factors listed in 18 U.S.C. § 3553(a)—to determine what sentence to impose. The central command in imposing a sentence is to fashion one that is sufficient, but not greater than necessary, to meet the goals set forth in § 3553(a).

### III. ANALYSIS

#### A. The Applicable Guidelines Range

The PSR calculated a Total Offense Level of 26 and a Criminal History Category of III, resulting in a guidelines range of 78-97 months. PSR, ¶ 95. Campbell objects to the inclusion of two criminal history points for his juvenile convictions for unauthorized use of a motor vehicle (PSR, ¶ 49) and receipt of a stolen vehicle (PSR, ¶ 50). Relatedly, Campbell objects to his overall Criminal History Category of III. The Government agrees with the Probation Officer that both prior convictions properly score one criminal history point and that Campbell was assigned to the correct Criminal History Category. *See* Govt. Response, ECF No. 32-1.

With respect to his first objection, Campbell seems to be under the belief that because he was not sentenced to a term of imprisonment or probation for either juvenile conviction, they score no criminal history points. But that simply is not the law with respect to convictions under U.S.S.G. §§ 4A1.1(c), 4A1.2(c), and 4A1.2(d)(2)(B). Rather, the guidelines make clear that one point is added under those sections for *any* qualifying "prior sentence"—i.e., for "*any* sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1) (emphasis added). The only exception is for a "diversionary disposition" in juvenile court—i.e., for a "[d]iversion from the judicial process <u>without a finding of guilt</u> (e.g., deferred prosecution)." *See* U.S.S.G. §4A1.2(f) (emphasis added). But that is not what happened in Campbell's cases. Instead, he was adjudged delinquent (i.e., he was found guilty) in both cases and judgment was entered against him on January 3, 2019, and October 15, 2020, respectively. PSR, ¶¶ 49-50. As such, both convictions properly earn one criminal history point, and the Court should overrule Campbell's first objection.[2]

---

[2] Even if the Court sustained Campbell's first objection, he would still score five criminal history points, which would still place him in Criminal History Category III.

With respect to his second objection, Campbell has not justified why a downward departure in his assigned Criminal History Category would be appropriate. A downward departure in a defendant's Criminal History Category may be appropriate "[i]f reliable information indicates that [the category assigned] <u>substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes</u>." U.S.S.G. § 4A1.3(b) (emphasis added). The application notes further explain that "[a] downward departure . . . may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." *Id.* app. n.3. Campbell has put forth no evidence or argument as to why his Criminal History Category substantially over-represents his criminal history or the likelihood that he will reoffend. Nor has he demonstrated how his situation parallels the example from the application notes. To the contrary, Campbell's juvenile convictions occurred quite recently—in 2019 and 2020, respectively—while he robbed the postal carriers at gunpoint in 2021. Likewise, his juvenile convictions were followed closely by adult convictions in 2019 and 2020 for disorderly conduct, improper handling of a firearm, and obstructing official business. PSR, ¶¶ 51-52. Under these circumstances, Campbell's assigned Criminal History Category does not substantially over-represent the seriousness of his criminal history or the likelihood that he will reoffend.[3] For these reasons, the Court should overrule his second objection.

---

[3] Indeed, as explained later in this memorandum, the United States Sentencing Commission has determined that federal defendants like Brandon Campbell—who have committed a violent offense—"generally recidivated at a higher rate, more quickly, and for more serious crimes than non-violent offenders." *See* U.S. Sent.'g Comm'n, *Recidivism Among Federal Violent Offenders*, 3 (Jan. 2019) (attached as Ex. A).

Likewise, the Sentencing Commission has determined that defendants like Campbell, who have amassed at least six criminal history points, have a rearrest rate of 66.8%, compared with a rearrest rate of 30.2% for defendants with zero criminal history points or 46.9% for those with just one criminal history point. *See* U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, 7 (March 2017) (attached as Ex. B).

### B. Possible Departures from the Applicable Guidelines Range

The Probation Officer did not identify any factors that would warrant a departure from the applicable guidelines range. *Id.* at ¶ 108. The Government agrees that no departures are warranted in this case.

### C. Consideration of the Sentencing Factors from 18 U.S.C. § 3553(a)

Finally, the Court must consider the applicable guideline range alongside the sentencing factors outlined in 18 U.S.C. § 3553(a) to fashion a sentence that is sufficient, but not greater than necessary, to meet Congress's sentencing goals. As explained below, nothing about this case takes it outside the "heartland" of the robbery guideline from U.S.S.G. § 2B3.1. As such, a within-guidelines sentence is appropriate.

#### 1. The Nature and Circumstances of the Offenses

The nature and circumstances of these offenses are as serious as they are troubling. Brandon Campbell, assisted by an unknown accomplice, robbed two letter carriers at gunpoint, all while wearing a ski mask that concealed his face. What's more, he threatened to shoot one of those victims if he did not turn over his arrow keys. Campbell fled the scene of both robberies in a car and ultimately fled from law-enforcement officers who tried to conduct a traffic stop on his vehicle following the second robbery. Ultimately, officers recovered four firearms from the apartment that Campbell fled into following that unsuccessful traffic stop. In addition to absconding with highly valuable arrow keys that belonged to the postal service, Campbell traumatized two innocent victims, who were simply trying to do their jobs. Both victims reported lasting impacts from these robberies, including anxiety, hypervigilance while on the job, and, with respect to Victim #2, a traumatized spouse who has understandably requested that he retire early just to stay safe.

All told, the nature and circumstances of these offenses merit a stiff sentence. To put matters into perspective, Campbell admitted to facts in his plea agreement that would have warranted prosecution for multiple counts of brandishing a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A)(ii). Those counts would have carried mandatory, consecutive terms of imprisonment of seven years each, which would have been stacked on top of whatever sentence the Court imposed for the underlying robberies. *Id.* Given Campbell's age and his willingness to accept responsibility early on in this case, however, the United States Attorney's Office opted to forego those § 924(c) charges. In short, Campbell has already received significant concessions in his sentencing exposure through the parties' plea bargaining. A six-and-a-half-year sentence is more than fair when compared with the alternative.

<u>2. The History and Characteristics of the Defendant</u>

Campbell's history and characteristics point to the same result and merit a within-guidelines sentence. Campbell, who is just twenty-one years old, has already amassed six criminal history points, which place him at the median criminal history recognized by the sentencing guidelines. That criminal history includes juvenile convictions for receiving stolen vehicles (three times) and unauthorized use of a motor vehicle. PSR, ¶¶ 47-50. Despite being placed on juvenile probation twice, Campbell did not learn his lesson. When he was eighteen, he fled from the police, which resulted in an adult conviction for disorderly conduct. *Id.* at ¶ 51. And when he was nineteen, he was pulled over by the police and again fled from officers and resisted arrest. After evading arrest, Campbell ran back to the car a short time later and tried to retrieve his loaded Glock handgun from the center console. *Id.* Campbell ultimately pled guilty to improper handling of a firearm, escape, and obstructing official business, though prosecutors dismissed his escape conviction at the time of sentencing. *Id.*

Campbell's criminal record is difficult to explain given the strong upbringing his mother provided. Campbell reported a stable upbringing with his mom and two brothers. *Id.* at ¶¶ 61, 63. His mother works at the Bureau of Workers' Compensation; his older brother just completed a successful enlistment in the U.S. Navy; and his younger brother is still in high school. *Id.* Although Campbell's father has been incarcerated for most of his life, his mother worked hard to provide for their family and, according to Campbell, "she provided adequate guidance and support" and "fill[ed] both the maternal and paternal roles" around the house. *Id.* at ¶¶ 62-63. Campbell stated that "he was raised in a good neighborhood" and that "he felt safe and never witnessed drug or gang activity." *Id.* He denied any domestic violence or substance abuse in their home. *Id.* Campbell's mother reported the same. *Id.* at ¶¶ 67-70. Although Campbell lost interest in high school around age 17, he was admitted to Cornell Abraxas, where he obtained his general education diploma ("GED"). *Id.* at ¶ 64. Campbell reported that he thrived in that structured environment. *Id.* He also reported that sports and athletics were key parts of his upbringing. *Id.* Campbell has been in a long-term relationship with Tekia Farmer, with whom he shares one child. *Id.* at ¶ 65. Aside from relatively modest use of alcohol, marijuana, and prescription opiates, Campbell did not report any serious substance abuse issues. *Id.* at ¶¶ 81-84.

In short, aside from his father's incarceration, Campbell cannot point to the typical mitigating factors that most defendants cite such as a turbulent upbringing; being raised in a bad neighborhood; being surrounded by gangs, drugs, and guns; or suffering from chronic mental health issues or substance abuse issues. To the contrary, as his mother stated, it seems "shock[ing]" that "Campbell . . . robbed two innocent individuals at gunpoint." *Id.* at ¶ 67. All told, nothing about Campbell's history or characteristics merit a below-guidelines sentence.

3. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment, as Well as the Need to Afford Adequate Deterrence

The Court must also consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to "afford adequate deterrence." 18 U.S.C. § 3553(a)(2)(A)-(B). The Government submits that a 78-month sentence will best serve these purposes. The goals of retribution and promoting respect for the law are important considerations in any sentencing, especially cases like this, involving innocent victims. The same goes for deterrence—both specific and general. A 78-month sentence will be the longest prison term he has served and will hopefully deter him (and others) from future criminal activity.

4. The Need to Protect the Public

The Court must also consider the need for the sentence imposed "to protect the public from further crimes of the defendant." *Id.* § 3553(a)(2)(C). Make no mistake, Campbell stands at the crossroads of three different types of federal offenders that make him *highly* likely to commit crimes in the future; to commit them more quickly following his release than other prisoners; and to commit more violent crimes in the future.

*Age of the Offender.* Start with Campbell's age. Following an extensive, years-long longitudinal study of 25,431 federal offenders, the Sentencing Commission concluded that "younger offenders were more likely to be rearrested than older offenders, were rearrested faster than older offenders, and committed more serious offenses after they were released [from prison] than older offenders." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Defenders* (Dec. 2017), 22 (Attached as Ex. C). Offenders under age thirty at the time of their release are the *most* likely to reoffend of any age bracket in the study—64.8% of this demographic were rearrested, with a median time to rearrest of just 17 months. *Id.*

10

*Nature of the Offense*.  Consider next the nature of Campbell's offenses.  Following the same study of 10,004 "violent prior offenders" and 15,427 "non-violent offenders," the Sentencing Commission concluded that defendants like Campbell, who had been convicted of robbery or other violent offenses, "generally recidivated at a higher rate, more quickly, and for more serious crimes than non-violent offenders."  *See* Ex. A, pp.1-2.  Violent offenders were rearrested within eight years of their release 63.8% of the time—nearly twice as frequently as non-violent offenders. *Id.* at p.4.  For offenders in Campbell's Criminal History Category, the numbers were even higher, with a rearrest rate of 67.3%.  *Id.* at p.14.  And for those offenders in Campbell's likely age bracket at the time of release (26-30 years old), the rates were higher yet, with a rearrest rate of 76.0%. *Id.* at p.16. The median time to rearrest among all violent offenders was just 18 months following their release.  *Id.* at p.4.  The numbers get worse when focused solely on the subset of violent offenders who were convicted of robbery.  As the Commission concluded, "Robbery offenders recidivated at a higher rate, more quickly, and for more serious offenses than did the other 1,400 violent instant offenders.  Robbery offenders recidivated at a rate of 66.8 percent compared to 54.5 percent for all other violent instant offenders."  *Id.* at p.27.  The median time to rearrest for robbery offenders was just 14 months, with another robbery being the most likely future crime.  *Id.*

*Criminal History*.  Finally, consider Campbell's criminal history.  Following the same study, the Sentencing Commission concluded that "recidivism rates are closely correlated with total criminal history points . . . , as offenders with lower criminal history scores have lower recidivism rates than offenders with higher criminal history scores."  *See* Ex. B, p.7.  Offenders like Campbell, who have amassed at least six criminal history points, have a rearrest rate of 66.8%, compared with a rearrest rate of 30.2% for defendants with zero criminal history points or 46.9% for those with just one criminal history point.  *Id.*

11

The upshot of the Sentencing Commission's studies is this: no matter how the Court looks at Campbell's case—whether based on his age, the nature of his offense, or the extent of his criminal history—he stands in a perilous place when it comes to the need to protect the public from further crimes on his behalf. He is more likely to reoffend, more likely to do so quickly, and more likely to do so violently than nearly any other class of federal offender. A within-guidelines sentence is necessary to protect the public from Campbell moving forward.

### 5. The Kinds of Sentences Available and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant

The Court must also consider "the kinds of sentences available" and "the sentencing range established for the applicable category of offense committed by the applicable category of defendant." *Id.* § 3553(a)(3)-(4). Based on a Total Offense Level of 26 and a Criminal History Category of III, the guideline ranges falls within Zone D of the sentencing table. As a result, "the maximum term shall be satisfied by a sentence of imprisonment." U.S.S.G § 5C1.1(f).

### 6. The Need to Avoid Unwarranted Sentencing Disparities

Finally, the Court must craft a sentence that accounts for "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Government submits that a within-guidelines term of 78 months' imprisonment will meet this goal. *See United States v. Houston*, 529 F.3d 743, 752 (6th Cir. 2018) ("Considering one of the fundamental purposes of the Guidelines is to help maintain national uniformity in sentences, and considering that most sentences are within the Guidelines, the Guidelines themselves represent the best indication of sentencing practices.").

### 7. Restitution

The Government is not seeking restitution in this case.

## IV. CONCLUSION

For these reasons, the United States requests that the Court adopt the factual findings and guidelines calculations from the PSR and sentence Campbell to 78 months of imprisonment, to be followed by a three-year term of supervised release, in addition to a $200 mandatory special assessment.

Respectfully Submitted,

KENNETH L. PARKER
United States Attorney


s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 469-5715
Fax: (614) 469-2200
Email: Noah.Litton@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Sentencing Memorandum was served electronically on all counsel of record on this 25th day of May, 2022.

s/Noah R. Litton
NOAH R. LITTON (0090479)
Assistant United States Attorney
